UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Holding in a Criminal Term

Grand Jury Sworn in on September 30, 2004

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | **CRIMINAL NO. 05-386 (ESH)** |
| | : | |
| **v.** | : | **VIOLATIONS:** |
| | : | |
| **ANTOINE JONES,** | : | **21 U.S.C. § 846 (Conspiracy to** |
| **also known as "Toine,"** | : | **Distribute and Possess with Intent** |
| **ADRIAN JACKSON,** | : | **to Distribute Five Kilograms or** |
| **MICHAEL HUGGINS,** | : | **More of Cocaine and Fifty Grams** |
| **KEVIN HOLLAND, and**_____ | : | **or More of Cocaine Base)** |
| **KIRK CARTER,** | : | |
| **Defendants.** | : | **21 U.S.C. §§ 841(a)(1) and** |
| | : | **841(b)(1)(A)(iii) (Unlawful** |
| | : | **Possession with Intent to** |
| | : | **Distribute Fifty Grams or More** |
| | : | **of Cocaine Base)** |
| | : | |
| | : | **21 U.S.C. §§ 841(a)(1) and** |
| | : | **841(b)(1)(C) (Unlawful Possession** |
| | : | **with Intent to Distribute Cocaine)** |
| | : | |
| | : | **18 U.S.C. § 924(c)(1)(A)(ii) (Using,** |
| | : | **Carrying, Brandishing, and** |
| | : | **Possessing a Firearm During a** |
| | : | **Drug Trafficking Offense)** |
| | : | |
| | : | **21 U.S.C. § 843(b) (Use of a** |
| | : | **Communication Facility)** |
| | : | |
| | : | **21 U.S.C. § 853 (Criminal** |
| | : | **Forfeiture)** |
| | : | |
| | : | **18 U.S.C. § 2 (Aiding and** |
| | : | **Abetting)** |

## SUPERSEDING INDICTMENT

The Grand Jury charges that:

## COUNT ONE

## NARCOTICS CONSPIRACY

## A.  THE CONSPIRACY

From at least sometime in 2003, the exact date being unknown to the Grand Jury, up to and including October 24, 2005, in the District of Columbia, the State of Maryland, the State of Texas, the State of North Carolina, and elsewhere, the defendants, **ANTOINE JONES, also known as Toine, (hereinafter "JONES"), ADRIAN JACKSON (hereinafter "JACKSON"), MICHAEL HUGGINS (hereinafter "HUGGINS"), KEVIN HOLLAND (hereinafter "HOLLAND"),** and **KIRK CARTER (hereinafter "CARTER"),** did knowingly and willfully combine, conspire, confederate and agree together and with Lawrence Maynard (hereinafter "Maynard"), John Adams (hereinafter "Adams"), Demetris Johnson (hereinafter "Johnson"), Roel Bermea, Jr. (hereinafter "Bermea"), Alberto Rolando Carrillo-Montelongo (hereinafter "Montelongo"), Ricardo Sanchez-Gonzalez (hereinafter "Sanchez-Gonzalez"), and other persons both known and unknown to the Grand Jury, to unlawfully, knowingly and intentionally distribute and possess with intent to distribute the following:

a) a mixture and substance containing a detectable amount of cocaine, a schedule II narcotic drug controlled substance, and the amount of said mixture and substance was 5 kilograms or more, in violation of Title 21 United States Code, Sections 841(a)(1) and 841(b)(1)(A)(ii);

b) a mixture and substance containing a detectable amount of cocaine base, in the form of

"crack," a schedule II narcotic drug controlled substance, and the amount of said substance was 50 grams or more, in violation of Title 21, United State Code, sections 841(a)(1) and 841(b)(1)(A)(iii).

## B. GOALS OF THE CONSPIRACY

It was the principal goal of the conspiracy that, in order to obtain as much money and other things of value as possible, the defendants, and co-conspirators not indicted herein, both known and unknown to the Grand Jury, acquired, repackaged, stored, processed, sold, and redistributed quantities of cocaine and cocaine base, in the form of crack, in the District of Columbia, the State of Maryland, the State of Texas, the Republic of Mexico, and elsewhere.

## C. MANNER AND MEANS TO EFFECTUATE THE CONSPIRACY

1. The members of the conspiracy played various and interchangeable roles based upon the needs of the conspiracy. **JONES** was the primary supplier of cocaine to members of the organization in the District of Columbia and the State of Maryland.

2. **JACKSON, HUGGINS, HOLLAND, CARTER,** Adams, Johnson, and others known and unknown to the Grand Jury, obtained cocaine from **JONES**. They in turn repackaged it in smaller amounts for redistribution to others. At other times, they redistributed the cocaine in kilogram form. They on occasion would process the cocaine they obtained from **JONES** into cocaine base in the form of crack cocaine before it was redistributed.

3. **JONES** was supplied with cocaine by various individuals, including persons he identified as "the Mexicans." These individuals, including Bermea, located in the State of Maryland, periodically supplied **JONES** with large quantities of cocaine. At times, these individuals were assisted in their distribution activities by others, including Montelongo and Sanchez-Gonzalez.

4. On some occasions, **JONES,** and/or Maynard, traveled out of the area to pick up cocaine,

3

and to deliver cash payment for the cocaine. On other occasions, individuals traveled to the Washington, D.C., area, to deliver large quantities of cocaine to stash locations where it was given to **JONES**, and to collect money from **JONES** and/or Maynard. In furtherance of this business relationship with their Mexican distributors, **JONES** and Maynard rented houses, apartments, and other locations in the Washington, D.C., area, where Bermea and others stored their cocaine. The cocaine distributors also stored in these stash locations large amounts of cash that **JONES** delivered to them in payment for cocaine, which they ultimately transported to Mexico. For example, on November 11, 2003, **JONES** rented for a period of six months an apartment located at 9719 Summit Circle, Apartment 3B, Largo, Maryland, for this purpose. And on January 10, 2004, Maynard rented for a period of six months a house located at 8550 Myrtle Avenue, Bowie, Maryland, for the same purpose. On February 27, 2004, a warrant-based search of 8550 Myrtle Avenue revealed several empty duffel bags, heat seal machines, heat seal wrappers, and rubber bands, along with a few air mattresses on the floor, but little additional furniture. On occasion, the suppliers themselves rented houses in the Washington, D.C., area, for the same purpose.

5. From time to time, Bermea, Montelongo, Sanchez-Gonzalez, and others, visited these stash locations to deliver cocaine and to collect, count, and package the money received from **JONES** in exchange for cocaine. These individuals then transported the money back to Mexico, via the state of Texas. These stash locations also served as temporary residences for Bermea, Montelongo, Sanchez-Gonzalez, and others.

6. The Mexican suppliers often used large trucks to transport large shipments of cocaine, often in excess of 200 kilograms, to the Washington, D.C., area, where they unloaded it into smaller vehicles and transported it to the stash locations for storage for as much as a month at a time.

4

7. **JONES** also rented warehouse facilities for the same storage purpose. For example, on or about April 30, 2004, a search of **JONES's** warehouse space, located at the Hampton Park Storage Facility, 400 Hampton Park Boulevard, Capitol Heights, Maryland, which he rented from November 17, 2003, until he broke the lease on April 30, 2004, revealed, among other things, several boxes of heat sealing wrappings and air mattresses, similar to the items identified in the search of the Myrtle Avenue house rented by Maynard.

8. **JONES** periodically collected money from some of his co-conspirators, including **JACKSON, HUGGINS, HOLLAND, CARTER,** Adams, Johnson, and others known and unknown to the Grand Jury. **JONES** then visited a storage location, and met with Bermea and others, to deliver quantities of cash, and pick up multiple-kilogram quantities of cocaine for distribution to these co-conspirators. For example, on September 28, 2005, **JONES** met with **HUGGINS** at his residence in Suitland, Maryland, where he remained for approximately 20 minutes. From there, **JONES** drove directly to the residence of Adams, and remained for approximately 20 minutes. After another similar meeting with an individual unknown to the Grand Jury, at 9:35 p.m., **JONES** drove to a stash location, 9508 Potomac Drive, Ft. Washington, Maryland, where he met with suppliers for approximately 45 minutes.

9. From at least some time in 2003, the exact date being unknown to the Grand Jury, through October 24, 2005, **JONES** supplied a number of unindicted co-conspirators, who are known to the grand jury, with kilogram and half-kilogram quantities of cocaine. **JONES** regularly "fronted," i.e., supplied on consignment, large quantities of cocaine to these co-conspirators, who are known to the Grand Jury. At other times, these co-conspirators paid **JONES** for the cocaine at the time he delivered it to them. These co-conspirators then frequently repackaged the cocaine into smaller

5

quantities, and distributed it either as cocaine hydrochloride or cocaine base, in the form of crack.
At times, some of the co-conspirators redistributed the cocaine in kilogram form. The total quantity
of cocaine **JONES** provided to these unindicted co-conspirators during this timeframe was in excess
of 150 kilograms.

10.    The physical transfer of cocaine and cash between **JONES** and these unindicted co-co-
conspirators, who are known to the Grand Jury, took place at Levels, a night club in the District of
Columbia owned and operated by **JONES** and managed by Maynard; at the Prince George's County
Sports Complex near FedEx Field in Landover, Maryland; at a Home Depot store, in Landover,
Maryland; at Sam's Car Wash on Branch Avenue, in Temple Hills, Maryland; and at other locations
known and unknown to the Grand Jury. Maynard frequently accompanied **JONES** when he met
with various co-conspirators to make deliveries of cocaine and to collect large cash payments. On
several occasions, Maynard also made deliveries of cocaine from **JONES** to the co-conspirators.
When communicating with some of these co-conspirators over the phone, to avoid detection by law
enforcement, **JONES** used "code" to avoid reference to drugs, money, or meeting places for the
transfer of drugs or payment for the drugs. The price **JONES** charged per kilogram varied between
$20,000, and $23,000, depending on who the co-conspirator was, among other factors. As part of
supplying cocaine to these co-conspirators, **JONES** informed one co-conspirator that **JONES** and
Maynard were making periodic trips outside of the Washington, D.C., area to obtain multi-kilogram
quantities of cocaine. In reference to the trips, **JONES** spoke of going to "Carolina" and cocaine
coming from the "Mexicans" and "Texas."

11.    In addition to Maynard, **JONES** also employed individuals, both known and unknown
to the Grand Jury, to assist in the day-to-day operations of his cocaine-trafficking business. For

example, Adams broke down larger amounts of cocaine into smaller packages for **JONES,** or Adams, to deliver to other co-conspirators, indicted herein, including **CARTER, HUGGINS**, Maynard, and Johnson.  Adams also collected drug payments for **JONES** from time to time.

12.  During the course of wire interceptions on **JONES's** cellular telephone, which ran from September 2, 2005, through October 24, 2005, the code phrases used by these co-conspirators and **JONES** to reference cocaine and money were often overheard, both in conversations between **JONES** and some of the unindicted co-conspirators, and in conversations between **JONES** and the other individuals he supplied, including **JACKSON, HUGGINS, CARTER, HOLLAND,** Adams, Johnson, and others known and unknown to the Grand Jury.

13.  Also during the wire interception, **JONES** spoke with many of his co-conspirators, including **JACKSON, HUGGINS, CARTER, HOLLAND,** Adams, Johnson, and others known and unknown to the Grand Jury, several times a week to arrange meetings at various locations throughout the Washington, D.C. metropolitan area.  On some occasions, **JONES** delivered wholesale quantities of cocaine to the customers, and on other occasions, the customers provided **JONES** money therefor.

14.  **JONES** also spoke with Bermea and another co-conspirator, not indicted herein, with some frequency during this timeframe, described in paragraph 12, to set up meetings to drop off cash and to collect multiple-kilogram quantities of cocaine, usually at a house located at 9508 Potomac Drive, Ft. Washington, Maryland.  During this time, **JONES** also spoke with another co-conspirator in the Mexican supply-chain, not indicted herein, to discuss the timing of large shipments of cocaine from Mexico into the Washington, D.C. area.

15.  In or about at least September and October, 2005, Bermea, Montelongo, and Sanchez-Gonzalez, and another co-conspirator not indicted herein, used the house located at 9508 Potomac Drive, Ft. Washington, Maryland, as a location in which they stored cocaine for distribution, including one time as much as100 kilograms of powder and crack cocaine.  They also used this residence for storage of cash payments, including as much as $800,000, which they received in exchange for the cocaine.  They also stored cash packaging equipment in this residence, including plastic shrink-wrapping materials, a heat-sealing machine, and a money-counting machine.  From time to time during this period, they also resided in the house.

16.  In or about at least October, 2005, defendants **JACKSON, HUGGINS,** Johnson, and Adams, used their residences in the state of Maryland to store cocaine, which they had purchased from **JONES**.  **JACKSON, HUGGINS,** Johnson, and Adams also stored large sums of money in their residences, the proceeds of cocaine sales to customers, along with firearms and drug packaging materials, including digital scales, and ziplock bags.  **CARTER** used his residence in the District of Columbia to store ammunition and drug packaging materials, including a digital scale and ziplock bags.

17.  From at least 2003, the exact date being unknown to the Grand Jury, up to and including October 24, 2005, **JONES** used his vehicle, a 2001 champagne-colored Jeep Grand Cherokee, MD license # M667480, to store cocaine and cash, which he had secreted in a variety of bags, including plastic shopping bags, duffel bags, and backpacks.  **JONES** also used his Grand Cherokee to transport cash to his suppliers, Bermea and others, and to transport cocaine from Bermea and others and deliver it to **JACKSON, HOLLAND, CARTER, HUGGINS,** Adams, Johnson, and other co-conspirators known and unknown to the grand jury**.**

**D. OVERT ACTS**

In furtherance of the conspiracy, and in order to effectuate the objects thereof, the defendants, and co-conspirators not indicted herein, whose identities are known and unknown to the Grand Jury, in various combinations, directly and indirectly, within the District of Columbia, the state of Maryland, the State of Texas, and elsewhere, committed overt acts including, but not limited to, the following:

**JONES's Distribution Network**

**Specific Distributions**

1.  In or about April, 2004, **JONES** distributed 500 grams of cocaine to an unindicted co-conspirator, known to the Grand Jury.

2.  In or about the first week of October, 2005, **JONES** distributed one-quarter of a kilogram of cocaine to an unindicted co-conspirator, known to the Grand Jury.

3.  On or about October 14, 2005, an unindicted co-conspirator, known to the Grand Jury, delivered $5,000, to **JONES** as advanced payment for one-quarter of a kilogram of cocaine.

4.  On or about October 23, 2005, Adams, delivered approximately $20,000, to **JONES** as advanced payment for a kilogram of cocaine.

**The Wire**

5.  On or about September 12, 2005, at approximately 10:37 p.m., **JONES** and Johnson had a coded conversation in which they discussed how much cocaine Johnson wanted to purchase from **JONES**, and payment issues.

6.  On or about September 15, 2005, at approximately 4:09 p.m., **CARTER** and **JONES** spoke in a coded conversation about meeting at Sam's Carwash on Branch Avenue, in Temple Hills, Maryland, to facilitate a cocaine transaction.

7.  On or about September 15, 2006, at approximately 4:25 p.m., **JONES** and **CARTER** met at Sam's Carwash, 3437 Temple Hills, Maryland, followed by a brief meeting at the Circuit City parking lot down the street, to facilitate a drug transaction.

8.  On or about September 18, 2005, at approximately 6:45 p.m., **JONES** and **HOLLAND** spoke in a coded conversation about meeting to facilitate a cocaine transaction, and **JONES** told **HOLLAND** to bring money.

9.  On or about September 18, 2005, in the evening, **JONES** and **HOLLAND** met at Rivertowne Commons shopping center, on Oxon Hill Road, in Oxon Hill, Maryland, where **HOLLAND** gave **JONES** a bag containing cash, as payment for cocaine.

10.  On or about September 20, 2005, at approximately 10:45 a.m., **JONES** spoke with one of his sources of cocaine, a co-conspirator not indicted herein, in a coded conversation regarding the timing of a shipment of cocaine.

11.  On or about September 23, 2005, at approximately 3:52 p.m., **JONES** told **JACKSON** in a coded conversation that **JONES** had left cocaine for **JACKSON** with Adams.

12.  On or about September 26, 2005, at approximately 6:35 p.m., **JONES** spoke with one of his sources of cocaine, a co-conspirator not indicted herein, in a coded conversation regarding the timing of a shipment of cocaine.

13.  On or about September 27, 2005, at approximately 8:47 p.m., **JONES** and **HUGGINS** had a coded conversation in which **HUGGINS** indicated a drug customer would pay **HUGGINS** the next day, frustrating **JONES** who was concerned that his suppliers would be angry because they wanted to be paid sooner.

14.  On or about September 27, 2005, at approximately 8:49 p.m., **JONES** and Johnson had a coded conversation in which Johnson indicated he was trying to collect some drug payments, frustrating **JONES** who was concerned that his suppliers would be angry because they wanted to be paid sooner.

15.  On or about September 27, 2005, at approximately 8:57 p.m., **JONES** and Adams had a coded conversation in which Adams said he was trying to collect payments from his customers, and **JONES** in turn stated he was attempting to collect payments.

16.  On or about September 27, 2005, at approximately 9:50 p.m., **JONES** visited the stash location at 9508 Potomac Drive, Ft. Washington, Maryland, for approximately 41 minutes.

17.  On or about September 28, 2005, at approximately 4:36 p.m., **JONES** and **HOLLAND** had a  coded conversation in which they discussed the possibility that **JONES** would have more cocaine available.

18.  On or about September 28, 2005, at approximately 4:58 p.m., **JONES** and one of **JONES**'s sources of cocaine, a co-conspirator not indicted herein, spoke in a coded conversation concerning when cocaine would arrive.

19.  On or about September 28, 2005, at approximately 5:30 p.m., **JONES** and **HUGGINS** had a coded conversation concerning whether **HUGGINS** had any money to give to **JONES**.

20.  On or about September 28, 2005, at approximately 5:30 p.m., **JONES** spoke with Adams.  In two coded conversations, they discussed the status of cocaine sales and money collection.

21.  On or about September 28, 2005, at approximately 5:36 p.m., **JONES** and an unindicted co-conspirator whose identity is known to the Grand Jury had a conversation concerning the status of the co-conspirator's drug sales.

22.  On or about September 28, 2005, at approximately 5:37 p.m., **JONES** and **JACKSON** had a coded conversation concerning cocaine supplies and money.

23.  On or about September 28, 2005, at approximately 5:38 p.m., **JONES** and **CARTER** had a coded conversation in which they discussed the status of **CARTER**'s drug supply and **JONES** picking up money from **CARTER**.

24.  On or about September 28, 2005, at approximately 7:00  p.m., **JONES** and one of **JONES**'s sources of cocaine, a co-conspirator not indicted herein, spoke concerning the arrival of a shipment of cocaine.

25.  On or about September 28, 2005, at approximately 7:31  p.m., **JONES** and Johnson had a coded conversation in which **JONES** indicated that cocaine had arrived.

26.  On or about September 28, 2005, at approximately 9:35 p.m., **JONES** visited the stash location located at 9508 Potomac Drive, Ft. Washington, Maryland, where he remained for approximately 41 minutes.

27.  On or about September 29, 2005, at approximately 7:33 a.m., **JONES** and Bermea had a conversation in which **JONES** indicated he would meet Bermea in 15 minutes.

28.  On or about September 29, 2005, at approximately 7:34 a.m., **JONES** and one of **JONES**'s sources of cocaine, a co-conspirator not indicted herein, had a conversation in which they agreed to  meet in 15 minutes.

29.  On or about September 29, 2005, at approximately 8:26 a.m., **JONES** visited the stash location, 9508 Potomac Drive, Ft. Washington, Maryland, where he remained for approximately 42 minutes.

30.  On or about September 30, 2005, at approximately 9:25 a.m., **JONES** and Bermea had a conversation in which **JONES** indicated he would meet Bermea in 10 minutes.

31.  On or about September 30, 2005, at approximately 9:26 a.m., **JONES** and one of **JONES**'s sources of cocaine, a co-conspirator not indicted herein, had a conversation in which **JONES** indicated he would meet the source in 10 minutes.

32.  On or about September 30, 2005, at approximately 9:49 a.m., **JONES** visited the stash location, 9508 Potomac Drive, Ft. Washington, Maryland, where he remained for approximately one hour.

33.  On or about October 1, 2005, at approximately 4:23 p.m., **JONES** and **HOLLAND** spoke in a coded conversation in which **HOLLAND** told **JONES** that he was out of cocaine, and the pair agreed to meet.

34.  On or about October 1, 2005, at approximately 7:04 p.m., **JONES** and Bermea had a conversation in which they discussed a quantity of cocaine, and **JONES** indicated he would meet Bermea in 15 to 20 minutes.

35.  On or about October 1, 2005, at approximately 7:08 p.m., **JONES** and one of **JONES**'s sources of cocaine, a co-conspirator not indicted herein, had a conversation in which **JONES** indicated he would meet the source in 10 minutes.

36.  On or about October 1, 2005, at approximately 7:56 p.m., **JONES** visited the stash location at 9508 Potomac Drive, Ft. Washington, Maryland, where he remained for approximately one hour.

37.  On or about October 3, 2005, at approximately 7:16 p.m., **JONES** and Bermea spoke about meeting.

38.  On or about October 4, 2005, at approximately 10:56 a.m., **JONES** and Bermea spoke about meeting in the next 15-20 minutes.

39.  On or about October 4, 2005, at approximately 11:19 a.m., **JONES** told Bermea that **JONES** would be at the stash location in 10 minutes.

40.  On or about October 4, 2005, at approximately 11:33 a.m., **JONES** and Bermea met at the stash location, 9508 Potomac Drive, Ft. Washington, Maryland, for approximately 12 minutes.

41.  On or about October 4, 2005, at approximately 4:25 p.m., **JONES** and Bermea spoke in a coded conversation about the arrival of a quantity of cocaine.

42.  On or about October 5, 2005, at approximately 11:10 a.m., **JONES** spoke with **HUGGINS** in a coded conversation regarding how much cocaine **HUGGINS** had sold and how much he had left.

43.  On or about October 7, 2005, at approximately 3:23 p..m., **JONES** and Bermea spoke in a coded conversation about the anticipated arrival of a quantity of cocaine the next day.

44. On or about October 8, 2005, at approximately 11:25 a.m., **JONES** and Bermea spoke in a coded conversation, in which Bermea told **JONES** that the cocaine shipment had been delayed and would probably not arrive until Monday (October 10). They agreed to meet in 15 -20 minutes.

45. On October 8, 2005, at approximately 11:59 a.m., **JONES** met with Bermea at the stash location, 9508 Potomac Drive, Ft. Washington, Maryland, for approximately 38 minutes.

46. On or about October 8, 2005, at approximately 12:46 p.m., **JONES** told **HOLLAND** in a coded conversation that the shipment of cocaine had been delayed.

47. On or about October 8, 2005, at approximately 7:38 p.m., **JONES** told **HUGGINS** in a coded conversation that the cocaine shipment had been delayed.

48. On or about October 9, 2005, at approximately 11:15 a.m., **JONES** and Bermea spoke in a coded conversation in which Bermea told **JONES** that he would call **JONES** as soon as the cocaine arrived.

49. On or about October 10, 2005, at approximately 6:05 p.m., **JONES** and one of **JONES**'s sources of cocaine, a co-conspirator not indicted herein, had a conversation in which the source indicated something would be happening in seven or eight days.

50. On or about October 10, 2005, at approximately 9:34 p.m., **JONES** had a conversation with Bermea, who told **JONES** that someone would be arriving in about four hours.

51. On or about October 11, 2005, at approximately 7:40 a.m., **JONES** and Bermea spoke in a coded conversation, in which Bermea told **JONES** that he had cocaine, and they agreed to meet in approximately 25 minutes.

52. On or about October 11, 2005, at approximately 7:56 a.m., **JONES** and **HOLLAND** discussed meeting.

15

53.  On or about October 11, 2005, at approximately 8:00 a.m., **JONES** and Johnson discussed meeting.

54.  On or about October 11, 2005, in two calls at approximately 8:19 and 8:40 a.m., **JONES** and **JACKSON** discussed meeting.

55.  On or about October 11, 2005, at approximately 8:43 a.m., **JONES** and Bermea spoke and agreed to meet in approximately 10 minutes.

56.  On or about October 11, 2005, at approximately 9:09 a.m., **JONES** met with Bermea at the stash location, 9508 Potomac Drive, Ft. Washington, Maryland, for approximately one hour and 45 minutes.

57.  On or about October 11, 2005, at approximately 11:56 a.m., **JONES** and **HUGGINS** spoke in a coded conversation regarding how much cocaine **HUGGINS** wished to purchase from **JONES**.

58.  On or about October 12, 2005, at approximately 12:36 p.m., **JONES** and Bermea spoke in a coded conversation in which Bermea indicated that a shipment of cocaine would be arriving the next day in the evening.

59.  On or about October 12, 2005, at approximately 12:44 p.m., in a coded conversation, **JONES** spoke with Adams and told him that a cocaine shipment was expected the next day.

60.  On or about October 12, 2005, at approximately 1:40 p.m., **JONES** and **HUGGINS** had a coded conversation in which **JONES** told **HUGGINS** that the shipment of cocaine was arriving "tomorrow."

61.  On or about October 12, 2005, at approximately 3:06 p.m., **JONES** and **JACKSON** had a coded conversation in which **JONES** told **JACKSON** that the shipment was arriving tomorrow.

16

62. On or about October 13, 2005, at approximately 12:45 p.m., **JONES** and Bermea had a conversation in which **JONES** stated that he had to make some "runs" but that they could meet in 30 minutes.

63. On or about October 13, 2005, at approximately 2:53 p.m., **JONES** spoke with **CARTER** in a coded conversation in which **JONES** indicated that a cocaine shipment would arrive that evening.

64. On or about October 13, 2005, at approximately 5:25 p.m., **JONES** and Bermea spoke in a coded conversation in which Bermea indicated that a shipment of cocaine would be arriving at approximately 8:00 o'clock that evening.

65. On or about October 13, 2005, at approximately 7:13 p.m., **JONES** and Bermea had a conversation in which **JONES** stated that he was five to 10 minutes away.

66. On or about October 13, 2005, at approximately 7:19 p.m., **JONES** met with Bermea at the stash location, 9508 Potomac Drive, Ft. Washington, Maryland, until approximately 7:47 p.m.

67. On or about October 13, 2005, at approximately 7:47 p.m., **JONES** called **HOLLAND**.

68. On or about October 13, 2005, at approximately 7:49 p.m., **JONES** called Johnson.

69. On or about October 13, 2005, at approximately 7:51 p.m., **JONES** called **HUGGINS**.

70. On or about October 13, 2005, at approximately 7:53 p.m., **JONES** called Adams.

71. On or about October 14, 2005, at approximately 7:01 a.m., **JONES** visited the stash location at 9508 Potomac Drive, Ft. Washington, Maryland, for approximately one hour.

72. On or about October 14, 2005, at approximately 9:25 a.m., **JONES** and an unindicted co-conspirator, whose identity is known to the Grand Jury, spoke in a coded conversation in which the co-conspirator indicated that it wanted to purchase cocaine from **JONES**.

17

73.  On or about October 14, 2005, at approximately 10:51 a.m., in a coded conversation, **JONES** told an unidentified co-conspirator, whose identity is known to the Grand Jury, that a cocaine shipment had arrived.

74.  On or about October 14, 2005, at approximately 10:55 a.m., **JONES** and the unidentified co-conspirator referenced in overt act 72 *supra* agreed to meet at Levels to facilitate a cocaine transaction.

75.  On or about October 17, 2005, at approximately 4:51 p.m., **JONES** spoke with **CARTER** in a coded conversation in which **JONES** told **CARTER** that half-kilograms of cocaine cost $10,500, at which **CARTER** expressed surprise.

76.  On or about Wednesday, October 19, 2005, at approximately 11:14 a.m., one of **JONES**'s sources of cocaine, a co-conspirator not indicted herein, left a coded message for **JONES** that a shipment of cocaine would be arriving on Thursday or Friday.

77.  On or about Wednesday, October 19, 2005, at approximately 11:15 a.m., **JONES** and one of **JONES**'s sources of cocaine, a co-conspirator not indicted herein, spoke and the source reiterated that a shipment of cocaine would be arriving on Thursday or Friday.

78.  On or about October 19, 2005, at approximately 5:19 p.m., **JONES** and Bermea had a conversation in which Bermea stated that he was home, and **JONES** stated that he would call him later.

79.  On or about Thursday, October 20, 2005, at approximately 6:25 p.m., **JONES** visited the stash location, 9508 Potomac Drive, Ft. Washington, Maryland, for approximately one hour and 20 minutes.

18

80. On or about October 23, 2005, at approximately 7:56 p.m., **JONES** spoke with an unindicted co-conspirator, whose identity is known to the Grand Jury, and stated in a coded reference that he had to make contact with his customers because cocaine was available.

81. On or about October 23, 2005, at approximately 7:56 p.m., **JONES** and **HUGGINS** spoke in a coded conversation in which **JONES** indicated that cocaine was available and they agreed to meet.

82. On or about October 23, 2005, in the evening, **JONES** and **HUGGINS** met to further a cocaine transaction.

83. On or about October 23, 2005, at approximately 8:48 p.m., **JONES** told Adams that he would arrive at Adams's residence in a few minutes.

84. On or about October 23, 2005, in the evening, **JONES** met with Adams, who gave **JONES** approximately $20,000, as advanced payment for a kilogram of cocaine.

85. On or about October 23, 2005, at approximately 9:11 p.m., **JONES** left **CARTER** a message to call him because something was "here."

86. On or about October 23, 2005, in the evening, **JONES** and **CARTER** met to further a cocaine transaction.

87. On or about October 23, 2005, at approximately 10:07 p.m., **JONES** told **HOLLAND** in a coded conversation that the cocaine shipment had arrived, and they agreed to meet the following morning.

**Search Warrants**

88.  On October 24, 2005, at his home in Waldorf, Maryland, **JONES** was in possession of in excess of $69,000, in cash, which he had recently collected from his customers, and which he was planning to deliver to Bermea as payment for a quantity of cocaine.

89.  On October 24, 2005, at his home in Landover, Maryland, **JACKSON** was in possession of proceeds from drug sales totaling $2,743, approximately 4 grams of crack cocaine, derived from cocaine which he had obtained from **JONES**, and a loaded handgun.

90.  On October 24, 2005, Adams was in possession of approximately 115 grams of cocaine, which he had obtained from **JONES**, along with two handguns and $9,600, in cash, which was proceeds from earlier drug sales.

91.   On October 24, 2005, **HUGGINS's** home in Suitland, Maryland, contained approximately 130 grams of cocaine, which he had obtained from **JONES**, along with $10,750, in cash, which was proceeds from earlier drug sales, and a digital scale and other drug packaging materials.

92.  On October 24, 2005, at his home in Waldorf, Maryland, Johnson was in possession of approximately one-half kilogram of cocaine, which he had previously obtained from **JONES**, along with $12,545, in cash, and a digital scale and other drug packaging materials.

93.  On October 24, 2005, a search warrant of 9508 Potomac Drive, Ft. Washington, Maryland, revealed 98 kilograms of cocaine, individually packaged and secreted in several duffel bags, 549 grams of crack cocaine, in excess of $800,000, at least $700,000, of which was packaged in heat-sealed bundles and secreted in duffel bags, heat sealing equipment and wrappers, ledger books and pay sheets, and several air mattresses, along with Montelongo, Sanchez-Gonzalez, and

Bermea, who was attempting to exit through an elevated bathroom window in the rear of the house.

94.  On October 25, 2005, **CARTER's** home in Southeast, Washington, D.C. contained drug

packaging equipment, including two digital scales, a strainer, and numerous empty ziplock baggies,

along with assorted ammunition and shotgun shells.

_____**(Conspiracy to Distribute and Possess With Intent to Distribute Five Kilograms or More of Cocaine and Fifty Grams or More of Cocaine Base,** in violation of Title 21, United States Code, Section 846)

## COUNT TWO

On or about May 11, 2004, in the District of Columbia, **ANTOINE JONES** and a co-

conspirator not indicted herein, who is known to the Grand Jury, possessed with intent to distribute

a mixture or substance containing a detectable amount of cocaine base, in the form of crack, a

schedule II narcotic drug controlled substance, and the amount of said mixture or substance was 50

grams or more.

(**Unlawful Possession with Intent to Distribute 50 Grams or More of Cocaine Base**, and **Aiding and Abetting**,  in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(A)(iii), and Title 18, United States Code, Section 2)

## COUNT THREE

On or about October 14, 2005, in the District of Columbia, **ANTOINE JONES** and a co-

conspirator not indicted herein, possessed with the intent to distribute a mixture or substance

containing a detectable amount of cocaine, a schedule II narcotic drug controlled substance.

(**Unlawful Possession with Intent to Distribute Cocaine**, and **Aiding and Abetting**, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(C), and Title 18, United States Code, Section 2).

## COUNT FOUR

On or about October 24, 2005, **ADRIAN JACKSON,** did unlawfully and knowingly use, carry, and brandish, during and in relation to, and possess in furtherance of, a drug trafficking offense, for which he may be prosecuted in a court of the United States, that is Count One of this Indictment which is incorporated herein, a firearm, that is, a Steyr M-40 semi-automatic pistol.

**(Using, Carrying, Brandishing, and Possessing a Firearm During a Drug Trafficking Offense**, in violation of Title 18, United States Codes, Section 924(c)(1)(A)(ii))

## COUNTS FIVE THROUGH THIRTY-FOUR

## USE OF A COMMUNICATION FACILITY TO FACILITATE A DRUG TRAFFICKING OFFENSE

On or about the dates set forth below, the defendants named below did unlawfully, knowingly, and intentionally use a communication facility, that is, a telephone, to facilitate the conspiracy to unlawfully distribute and possess with intent to distribute cocaine and cocaine base, in the form of crack cocaine, Schedule II narcotic drug controlled substances, as charged in Count I of this Indictment and incorporated by reference herein, in violation of Title 21, United States Code, Section 846.  The overt acts identified below are realleged and incorporated by reference herein.

| Count | Date and Time (All dates are on or about and all times approximate and Eastern Standard Time) | Defendant | Overt Act |
|---|---|---|---|
| 5 | September 12, 2005, 10:37 p.m. | **ANTOINE JONES** | 5 |

| 6 | September 15, 2005, 4:09 p.m. | **ANTOINE JONES, KIRK CARTER** | 6 |
| 7 | September 18, 2005, 6:45 p.m. | **ANTOINE JONES, KEVIN HOLLAND** | 8 |
| 8 | September 20, 2005, 10:45 a.m. | **ANTOINE JONES** | 10 |
| 9 | September 23, 2005, 3:52 p.m. | **ANTOINE JONES, ADRIAN JACKSON** | 11 |
| 10 | September 26, 2005, 6:35 p.m. | **ANTOINE JONES** | 12 |
| 11 | September 28, 2005, 5:37 p.m. | **ANTOINE JONES, ADRIAN JACKSON** | 22 |
| 12 | September 28, 2005, 5:38 p.m. | **ANTOINE JONES, KIRK CARTER** | 23 |
| 13 | October 1, 2005, 4:23 p.m. | **ANTOINE JONES, KEVIN HOLLAND** | 33 |
| 14 | October 5, 2005, 11:10 a.m. | **ANTOINE JONES, MICHAEL HUGGINS** | 42 |
| 15 | October 8, 2005, 11:25 a.m. | **ANTOINE JONES** | 44 |
| 16 | October 8, 2005, 12:46 p.m. | **ANTOINE JONES, KEVIN HOLLAND** | 46 |
| 17 | October 8, 2005, 7:38 p.m. | **ANTOINE JONES, MICHAEL HUGGINS** | 47 |
| 18 | October 10, 2005, 6:05 p.m. | **ANTOINE JONES** | 49 |
| 19 | October 11, 2005, 11:56 a.m. | **ANTOINE JONES, MICHAEL HUGGINS** | 57 |
| 20 | October 12, 2005, 12:36 p.m. | **ANTOINE JONES** | 58 |
| 21 | October 12, 2005, 12:44 p.m. | **ANTOINE JONES** | 59 |
| 22 | October 12, 2005, 1:40 p.m. | **ANTOINE JONES, MICHAEL HUGGINS** | 60 |
| 23 | October 12, 2005, 3:06 p.m. | **ANTOINE JONES, ADRIAN JACKSON** | 61 |

| 24 | October 13, 2005, 2:53 p.m. | **ANTOINE JONES, KIRK CARTER** | 63 |
|----|----|----|----|
| 25 | October 13, 2005, 5:25 p.m. | **ANTOINE JONES** | 64 |
| 26 | October 14, 2005, 9:25 a.m. | **ANTOINE JONES** | 72 |
| 27 | October 14, 2005, 10:51 a.m. | **ANTOINE JONES** | 73 |
| 28 | October 14, 2005, 10:55 a.m. | **ANTOINE JONES** | 74 |
| 29 | October 17, 2005, 4:51 p.m. | **ANTOINE JONES, KIRK CARTER** | 75 |
| 30 | October 19, 2005, 11:15 a.m. | **ANTOINE JONES** | 77 |
| 31 | October 23, 2005, 7:56 p.m. | **ANTOINE JONES, MICHAEL HUGGINS** | 81 |
| 32 | October 23, 2005, 8:48 p.m. | **ANTOINE JONES** | 83 |
| 33 | October 23, 2005, 9:11 p.m. | **ANTOINE JONES** | 85 |
| 34 | October 23, 2005, 10:07 p.m. | **ANTOINE JONES, KEVIN HOLLAND** | 87 |

(**Use of a Communication Facility**, in violation of Title 21, United States Code, Section 843(b))

## FORFEITURE ALLEGATION

Upon conviction of the controlled substance offense alleged in Count One of this Indictment, defendant **ANTOINE JONES** shall forfeit to the United States pursuant to 21 U.S.C. § 853, any property constituting, or derived from, proceeds obtained, directly or indirectly, as a result of the said violation and any property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of the said violation, including but not limited to the following: MONEY JUDGMENT – a sum of money equal to $1,000,000, in United States currency, representing the amount of proceeds obtained as a result of the offense, Conspiracy to Distribute and Possess with

24

Intent to Distribute Five Kilograms or More of Cocaine, and Fifty Grams or More of Cocaine Base.

If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

(a)  cannot be located upon the exercise of due diligence;

(b)  has been transferred or sold to, or deposited with, a third party;

(c)  has been placed beyond the jurisdiction of the court;

(d)  has been substantially diminished in value; or

(e)  has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to 21 U.S.C. § 853(p), to seek forfeiture of any other property of said defendant up to the value of the forfeitable property described above.


All in accordance with 21 U.S.C. § 853 and Rule 32.2 of the Federal Rules of Criminal Procedure.

_____(**Criminal Forfeiture,** pursuant to Title 21, United States Code, Section 853**)**


A TRUE BILL:


FOREPERSON.


Attorney of the United States in
and for the District of Columbia