UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---X

THE UNITED STATES OF AMERICA    Criminal Case No.

v.    05-386

ANTOINE JONES, et al,

Defendants,

---X    Washington, D.C.
Wed., November 1, 2006
9:20 A.M.
VOLUME FOUR- A.M. SESSION
TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE ELLEN SEGAL HUVELLE
UNITED STATES DISTRICT JUDGE, and a jury

APPEARANCES:

For the Government:    JACK GEISE, ESQUIRE
RACHEL LIEBER, ESQUIRE
Office of the U. S. Attorney
555 4TH Street, N.W.
Washington, D.C.    20560
(202) 616-9156

For Defendant Jones:    EDUARDO BALAREZO, ESQUIRE
400 Fifth Street, N.W.
Suite 500
Washington, D.C.    20001
(202) 639-0999

Court Reporter:    Lisa Walker Griffith, RPR
U.S. District Courthouse
Room 6409
Washington, D.C.    20001
(202) 354-3247

Proceedings recorded by mechanical stenography, transcript produced by computer.

---

APPEARANCES: (Cont'd.)

For Defendant Jackson:    JON NORRIS, ESQUIRE
641 Indiana Avenue, N.W.
2nd Floor
Washington, D.C.    20001
(202) 842-2695

For Defendant Huggins:    RUDOLPH ACREE, ESQUIRE
1211 Connecticut Avenue, N.W.
Suite 303
Washington, D.C.    20036
(202) 331-0739

Fo    Defendant Holland:    BRIAN McDANIEL, ESQUIRE
1211 Connecticut Avenue, N.W.
Suite 506
Washington, D.C.    20036
(202) 331-0739

---

P R O C E E D I N G S

THE DEPUTY CLERK:    Criminal Case Number 05-386, United States versus Antoine Jones, et al.

THE COURT:    Wro'a your next witness please?

W. GEISE:    Officer Frederick Mltehead, Your Honor.

(Jury Present.)

THE COURT:    Good horning, ladies and gentlemen. W!' re ready to begin.    M. Gelas, call your witness please.

W. GEISE:    Yes, Your Honor.    The Government calls Officer Frederick Whitehead.

FREDERICK WHITEHEAD, GOVERNMENT WITNESS, SWORN

DIRECT EXAMINATION

BY W. GEISE:

Q    Sir, for the record, would you please state your name and spell your last nave.

A    Frederick M W)itahead, W-H-I-T-E-H-E-A-D.

Q    And how are you employed, air?

A    Wth the Durham Police Department.

Q    How long have you been with the Durham Police Depart sent?

A    Almost ten years.

Q    How are you employed Wth the Durham Police Depart (rent?

A    St 111 currently assigned with the Durham Police

---

4

Department as a uniform patrol officer.

Q    Prior to working for the Durham Police Department, how were you employed, air?

A    I was assigned to the interstate crimnal interdiction unit.

Q    Prior to the Durham Police Depart (rent, how were you employed?

A    I was in the United States Arny.

Q    Mere with the Army?

A    I was a neuter of a S. R. T. teant which is a 82nd Air borne Divialon.

Q    Mat does a S. R. T. teams do?

A    Special Response Teant it's almost like a SWAT nember with the police force.

Q    I am going to ask you to turn your attention to Tuesday, April 5th of last year, so Tuesday, April 15, 2005.    Wire you on duty that day, air?

A    Yes, Sir, I wes.

Q    Approximately 2:30 in the afternoon, did something occur?

A    Yes, sir, it did.

Q    Wluld you tell the members of the jury what happened at that tine?

A    k' partner and I at the tine were nonitorng the traffic, 85 southbound.    Wt were sitting on the southbound

1  side of the median imminent the traffic coming into, coming
2  through Durham North Carolina, when I observed a green Honda
3  Odyssey mini van travelling at a high rate of speed.
4          By the time I made a visual estimation and I
5  corroborated with my stationary radar unit, which is a
6  Customs K R T. N., I clocked the vehicle at 67 in a 55.    At
7  that point, I left from my parked position and turned around
8  and caught up with the vehicle where I made a traffic stop.
9  Q    Just if you would tell me, sir, what was the license
10 plate on that vehicle?
11 A    It was a Maryland tag.    I don't have the tag number.    I
12 can't remember what the tag number was, but it was a Maryland
13 tag.
14 Q    If I showed you your report, would that help, sir?
15 A    Yes, sir, it would.
16 Q    You did do a police report for that, sir?
17 A    Yes, I did.
18      Let me show you a copy of your report, sir.
19         THE COURT:    What is that for identification?
20         MR. GEISE:    I'll call it NC 11 for identification,
21 Your Honor.
22 BY MR. GEISE:
23 Q    And while I'm up here, sir, let me show you, since I'm
24 up here anyway, a photo that's been marked NC Stop 6.    Let me
25 ask you, what was the license plate number on that car?

1       It was Maryland tag 273, M as in Mary, 195.
2  Q    Since you got it in front of you any way, let me ask you
3  if you recognize the photo NC Stop 6.
4  A    Yes, sir, I do.
5  Q    What's that a photo of?
6  A    It's a picture of a green Honda Odyssey mini van.
7  Q    Is that the one you stopped?
8       Yes, sir, it appears to be.
9  Q    Although that photo isn't at the stop point?
10 A    No, sir, it is not.
           MR. GEISE:    Your Honor, I do move the admission.
           MR. BALAREZO:    No objection.
           THE COURT:    It will be admitted.    What page of the
   exhibit list?
           MR. GEISE:    We're on Page 29, Your Honor.
           THE COURT:    Thank you.    All right.    That's
   admitted.    Is it on the screen?
           (Government Exhibit Number NC Stop 6
            was admitted into evidence.)
           MR. GEISE:    I don't believe yet, Your Honor.
           THE COURT:    Where was this taken again?    Where was
   the picture taken?  Oh, you didn't take it.    Okay.    I'm
   sorry.
           THE WITNESS:    No, ma'am

BY MR. GEISE:
2  Q    Is that the vehicle you stopped?
3  A    Yes, sir, it is.
4  Q    But it's not at the location where you stopped it?
5       No, it's not.
6          THE COURT:    That's NC Stop 6?
           MR. GEISE:    Yes, that am NC Stop 6.
           THE COURT:    All right.    Six is admitted.
           MR. GEISE:    Again, if I might approach the witness.
   BY MR. GEISE:
   Q    Sir, let me show you what's been marked NC Stop 10,
   which is a Maryland Motor Vehicle Administration document.
           MR. BALAREZO:    Your Honor, may we approach before
   he gets into this.
           THE COURT:    Yes.    Excuse us one minute.
           (Bench conference.)
           MR. BALAREZO:    Your Honor, my understanding is that
   the Government is going to try to use these documents to get
   this witness to say that Mr. Jones was a registered, that the
   car was registered to him
           THE COURT:    That's what the title says.
           MR. BALAREZO:    I object because there is, right
   here all we have is, if I could point out each item we have
   a temporary inspection waiver to Antoine Jones.    Does not
   indicate necessarily that he owned it at the time of the

stop, which was in '05.    I think this document is dated '04.
2  I can look at nine.    This right here is an inspection
3  certificate that has nothing to do with Jones.
4          THE COURT:    It is a certificate of title.
5          MR. BALAREZO:    Again, date, about a year earlier.
6  Doesn't necessarily mean that Mr. Jones owned the car on the
   date that it was stopped, which is in '05.
           This right here is a, not a registration
   certificate, this is a receipt.    We don't know whether
   Antoine Jones paid for it.    We don't know whether this is
   Antoine Jones.    It doesn't tell us anything.    There is a
   certificate of title.    Again it's dated almost a year
   earlier.
           MR. GEISE:    This is the May 6, 2005, document from
   M V. A. of their records.    So this is what they have got in
   their record about two months after the stop.
           THE COURT:    I think it is pretty potent evidence.
   He is the registered owner.    This is certainly a business
   record.
           MR. BALAREZO:    Your Honor, it may be a business
   record, but at all it show is that Antoine Jones in 2004 at
   some point had something to do with this car.    Does not show
   that it was at the time he seized the money.
           THE COURT:    It shows that it was registered to him
   at the time of May 6, 2005.

10

1  Mt. BALAREZO: Do we know Mat that date is?
2  THE COURT: It shows -- I don't know, fifth nonth
3  of the year.
4  kR. BALAREZO: That's fine.
5  Mt. GEISE: 5th nDnt h of the year.
6  THE COURT: This is what they have to show who the
car was registered to. Overruled.
   k5. LIEBER: So the record is clear. There is also
a certificate from Mr. Jones's house that we're rmving in
through another witness that shows insurance coverage for the
van between February of '05 and August of '05.
   THE COURT: Okay. Overruled, that's ten. That's
admtted over objection.
       (Government Exhibit Nunber NC Stop 10
        was admitted into evidence.)
       (Open Court.)
   THE COURT: Okay.
BY Mt. GEISE:
 0 Sir, I went to show you what's been perked as NC Stop
10, which is a kbryland Wt or Vehicle Adninistration docunent
for vehicle tag kbryland 273M195. That's the vehicle you
stopped?
 A Yes, sir.
   Mt. GEISE: I'll night approach the witness, Your
Honor.

11

1  0 Now, let ne show you what's been norked as Governnent
2  Exhibit NC Stop 7 and ask if you recognize that?
3  A Yes, I do.
4  0 Mat is it?
5    It's a kbryland driver's license for a Lawrence kbynard.
6  W GEISE: Your Honor, at this point --
   THE COURT: I'm sorry. It's not coneng up on
either screen.
   Mt. GEISE: At this point, I nove the admssion of
the Iterq Your Honor, and ask that it be put In the screen.
   THE COURT: Any objection?
   AR. BALAREZO: No.
   THE COURT: Stop 7 is ln.
       (cover nment Exhibit Number NC Stop 7
        was admitted into evidence.)
   THE COURT: Is the of her one up?
   MR. GEISE: Yes, Warn
BY W. GEISE:
 • And who is the driver of the vehicle, sir?
 A W. Lawrence kbynard.
 • Just Mat address is that? I don't know that we can all
see It?
 A 7711 Greenleaf Road in Hyattsvilfe, P.G. kbryland.
 • Now, after W. kbynard, you say you had him exit the
vehicle?

2

   THE COURT: Okay.
BY Mt. GEISE:
 • There are a number of itema on that, sir. But I'd just
ask If you'd look at one of then% application for certificate
of title for that vehicle. Whose nave is that?
 A It reads Antoine Jones.
 0 And certificate of title for the vehicle showing a
transfer to, who does it shows transfer to, sir?
 A Antofne Jones.
 0 Now, sir, you've said you stopped the vehicle that's
pictured NC Stop 6, M V. A records showing Antoine Jones's
vehicle. What did you do then, sir?
 A Then I exited my patrol vehicle and I walked up to the
right passenger's side of the vehicle where I made contact
with the driver.
 • Wbuld you please tell us what happened then?
 A Asked the driver for his license and registration which
he provided ma. At that point in time, I asked him if he
would step out of the driver's seat and step to the rear of
his vehicle between my vehicle and his vehicle.
 0 Officer Wrilehead, at some point did you obtain the
driver's license from that individual?
 A Yes, I did.
 • Did you make a copy of it?
   Yes, sir, at sons point, I did.

12

   Yes, sir.
2  • What happened then, sir?
3  A I then informed him my reason for the stop. He told ire
that he --
5  Mt. BALAREZO: Objection.
6  NR. GEISE: If we night approach briefly, Your
Honor.
   THE COURT: Okay. Excuse us, ladies and gentlenen.
       (Bench conference.)
   THE COURT: Mat 'a he about to say?
   Mt. GEISE: I'll run through It all quickly. What
he is going to describe is conversations with both kbynard
and the passenger, Derrick Gordon. He questioned them where
they were going. They had different stories, which, of
course, made him suspicious and a stop developed from then.
       There are really two points, Your Honor. From our
points of view it is truly not offered for the truth of the
matter because we don't think It is true. Secondly, there
won't be testimony that this trip was to pick up drugs from
one of the cooper ators. So, this is actually ln furtherance
of the conspiracy because they were trying to convince the
officer to let them go. W* think either theory is
appropriate. But certainly we don't believe it is --
   THE COURT: Yeah, My is it offered for the truth
even? They're going to say things about where they're going

13

or not going. It is offered to show why he was suspicious I
think.
    MR. GEISE: Yes, ma'am.
    MR. BALAREZO: Your Honor, I think he can say
something that caused no to do --
    THE COURT: They could but they don't have to.
There is no evidentiary reason. I suspect we'll ultimately
find it was in furtherance of the conspiracy because at least
one of these guys, if not both, will be --
    MR. GEISE: Yes, ma'am.
    MR. BALAREZO: It has to be to show that it is in
furtherance of the conspiracy. I think you need to show more
than he was a co-defendant in this case.
    THE COURT: You have to show a lot down the road
apiece when you tie it all up. But he can put it in subject
to being tied up later on. So, more importantly, it is not
offered for truth so overruled.
    (Open Court.)
BY MR. GEISE:
Q  Yes, sir. You were describing your conversation with
Mr. Maynard.
A  Yes, sir, I was.
Q  Please proceed.
A  He had already given me his license and registration.
So I was just informing him of my reason for stopping him

14

which was speeding. I told him I clocked him at 67 in a 55.
And the 55 just so happened to be in a work zone.
Q  You said he was going, I'm sorry, he was doing what?
A  67 miles an hour in a 55 mile-an-hour work zone.
Q  What was your conversation with him after that?
A  I then asked him where was he coming from or what was
the origin of his trip. He told me he was coming from the
Washington, D.C., Maryland area. And he was headed to South
Carolina, a city in South Carolina I had never heard of
before. But his reason for going there, he was going to pick
up a D.J. for an upcoming event that he had back up at his
nightclub in Washington, D.C., for the upcoming weekend.
Q  At that point, what did you do, Officer Whitehead?
A  I then asked him a couple of questions about his
passenger, who, when I initially made contact with the
vehicle, appeared to be asleep.
Q  Was it just the driver and the passenger?
A  Yes, it was.
Q  That's in the front passenger's seat?
A  Yes.
Q  Please proceed, sir.
A  When I asked him about his passenger, he could only tell
me his first name. I then asked him well, how long had he
known him. He said that they worked together at the
nightclub. I asked him do you have an age on him or

15

approximate age. He couldn't tell me that either. So at
that point, I asked Mr. Maynard if he would just stand at the
rear of the vehicle while I went up and talked with the
passenger, which I did.
Q  What happened when you went up to the passenger, sir?
A  When I went back up to the vehicle and made contact with
him the passenger, who was now awake and he was at 111
leaning back in the seat. I introduced myself to him and
asked him if he had any ID. As soon as I asked him if he had
any ID, he kind of sat up real quickly and abrupt-like
offensively and asked me why did I need to see his
identification.
    I told him that, you know, we'd like to know who
we're dealing with when we have cars stopped on the highway.
You know, he was aware of the terrorist attacks. Just for
identification purposes I needed to know who I was dealing
with.
    At that point in time, with a little hesitation, he
told me that his identification was in his wallet in his back
pants pocket and asked if he could get it. I told him he
could, and he reached in his back pants pocket, reached
inside of his wallet and produced a identification.
Q  Let me show you for the moment, Officer, what's been
marked as -- let me ask this. At some point, did you make a
Xerox copy of the identification that gentlemen provided?

16

A  Yes, sir, I did.
Q  Let me show you what's been marked as NC Stop 8. Let me
ask if you recognize that?
A  Yes, sir, I do.
Q  What is it?
A  It's a Washington, D.C., Learner's Permit for a Derrick
C. Gordon.
    MR. GEISE: Your Honor, I'd like to move the
admission of the item and ask that it be placed on the
screen.
    MR. BALAREZO: No objection.
    THE COURT: It will be admitted, 8.
    (Government Exhibit Number NC Stop 8
     was admitted into evidence.)
BY MR. GEISE:
Q  Now, you're saying it was a Learner's Permit for --
A  Derrick C. Gordon.
Q  Did the passenger in the vehicle identify himself as
Derrick Gordon?
A  Yes, sir, he did.
Q  What did you do then, Officer Whitehead?
A  At that point, I rode some conversation with W. Gordon.
I asked him where was he coming from and he informed me he
was coming from the Washington, D.C., Maryland area. And I
asked him where he was headed to. He told me he was headed,

17

he and W. kaynard were headed to Atlanta, Georgia to visit sone fardly and to visit sons young ladies that they had net on a previous visit to Atlanta, Georgia.

Q Did you have further discussion with kh. Gordon at that point?

A I did.

Q Mat was that, air?

A I, in turn, asked 1k. Gordon was M'. kbynard aware that they were going to Atlanta, Georgia. He said yes, that he wes aware of it.

Q Now, did those conversations with 1. kbynard and M'. Gordon cause any concern for you?

A Yes, of r.

Q Why was that?

A Because ft was a conflict ion of stories. I had the driver telling ire that they were going to South Carolina to pick up a disk jockey for an upconing event at a nightclub back In Wbshlngton, D. C. I had the passenger telling ne they were going to Atlanta to hang out for the weekend with family and some young ladies that they had net on a previous visit.

Q You rentioned, of r, W. kbynard had said lt was for his nightclub. Do you renerdrer off hand what the nave of that nightclub vas that he told you?

A Club Levels.

Q After you had that conversation with 1k. Gordon, Mat

18

did you do, sir?

A Will, once I finished with W. Gordon, I turned and vent back to 8t. kbynard, and I asked 1k. kbynard, once again, I said, wel 1 are you sure you're going to where you told me you're going. He said, yeah, I'm going to South Carolina to pick up a D. J. for an upconing event at the nightclub this cord ng weekend.

Q What did you do then, sir?

A I then told I*. kbynard he could stand in between the vehicles or he could have a seat on the guardrail while I went back to ny vehicle and ran his iof or net ion along with 1. Gordon's lot orniti on.

Q Wren you say "run their Infornstlon," what do you nean, sir?

A Run It through the network, check their driver's license status and the N. C. I. C., which is the National Crine Information Center, to nuke sure they don't have any warrants or anything like that on them

Q Mat did you do then, sir?

A Mile I was waiting on that iof or nit ion to cone, **fly** partner, he had arrived, and I pretty much explained to him the conflicting atom es, how nervous and agitated W. Gordon seemed to be just to be the passenger of the vehicle.

And at that point in tine, I pretty much told my partner, I said hell, I think I'm just going to write them a

19

warning ticket, W. kbynard a warning ticket. So, I did that, but prior to starting to write the warning ticket, I said I'd call out a K-9 officer to cone to our location.

Q (that happened then?

A Before I vas completed with the warning ticket and once I ran all the Information, the K-9 officer responded to the location. I got out of my vehicle, gave kir. kbynard his I of or motion back, and I told him that I was just giving him a warning ticket because rrost people that are travelling through the area kind of get a little confused about the speeding of gns.

So I was just going to give him a written warning with no fines, no court costs or anything like that, but he just needed to nonitor his speed. I told him if he wuld just renal n at the back of the vehicle win I e I went and returned W. Gordon's identification back to him he'd be free to go.

Q Mat did you do? (That happened at that point?

A Once I returned W. Gordon's Identification, I cane back --

SR. BALAREZO: Objection, Your Honor.

THE COURT: Objection? He's going to tell us what he did next.

S. BALAREZO: I don't know about that.

THE COURT: That' a what the question was. What did

20

you do next, right? Overruled. Go ahead.

THE WITNESS: I then cane back to where ht. kbynard ws. Wr shook hands, and he turned around and vent back to his vehicle.

Q he had gotten back to the vehicle, he pretty much opened up the driver's door and was getting ready to enter the vehicle, and I called out to him I said, Nh. kbynard, do you rd nd if I ask you a couple of quick questions. He turned and looked in my direction. He closed the door back and he walked back to where I was. He said, yes, you can.

Q that particular point in firm, I walked to him and I asked him I said, by any chance are you transporting any large suns of rmney, explosives or Illegal weapons in the vehicle.

Q Mat happened at that point?

A There was a umrrent ary pause, and it was al nest lf ke he held his breath, and he kind of, you know, he tried to say something, but it just wouldn't cone out. And after about, I guess, about 15 or 20 seconds, he responded back. He was li ke, no, I don't have anything in my vehicle, but I do have a cooler in vhfch I didn't put any ice in that's in the back of the vehicle. And that was totally off kilter of what I had asked of him

Q Wrat happened after that?

71

1  A   Then he mentioned that he had a cooler in the rear or
2  the hatch back area of his vehicle, he went to reach to open
3  up the hatch back.  I told him I said, you don't have to
4  open it up.  I said, you know, does this mean you're giving
5  me consent to search the vehicle or not.  He said yes, you
6  can search it.
7      So at that point in time, I asked him if he had any
8  weapons on his person.  He said no.  I then told him that I
9  was going to do a quick Terry frisk.  I just patted down his
10 outer clothing around his waist band.
11 Q   What's a Terry frisk, sir?
12 A   It's just an outer clothing frisk, not obtrusive, where
13 you just pat someone's outer clothing to see if they have any
14 weapons or anything on him.
15 Q   Did Lt. Maynard have any weapons on him?
16 A   No, sir, he did not.
17 Q   What did you do at that point?
18 A   I then informed W. Maynard, my partner had got out of
19 his vehicle by that time, and I asked him just to at and back
20 in between my vehicle and his vehicle with my partner.  At
21 that point in time, I went up to the passenger's side where
22 Mr. Gordon was located and asked Mr. Gordon to step out of
23 the vehicle.
24    And when I asked him to step out of the vehicle, he
25 went ad to know why he had to get out of the vehicle.  Then I

72

1  instructed him that Mr. Maynard had given me consent to
2  search the vehicle.
3  Q   What happened then with Lt. Gordon?
4  A   He was very methodical and very slow with exiting out of
5  the vehicle.  He actually, once he opened up the door, he
6  actually tried to get out of the van with the seat belt on.
7  And I told him I said, you know, you may want to take the
8  seat belt off.  So he, in turn, took the seatbelt off.
9      I had him to turn around right in the door
10 threshold where I asked him the same thing.  I asked him if
11 he had any weapons or anything on him He said no.  Also
12 completed a Terry frisk of his outer clothing.
13 Q   Did he have any weapons?
14 A   No, sir.  He didn't have any weapons.
15 Q   What happened then?
16 A   While I was getting ready to pat him down, I noticed,
17 when he was sitting in the car, he had a large bulge in his
18 front right pants pocket.  I asked him what it was.  He told
19 me that was his money.
20     I then asked him I said, well, I'm going to need
21 you to take it out just so that I can confirm that it is, in
22 fact, money, and he did.  When I asked him about how much
23 money it was, he told me it was about $900 or so.  At that
24 point, I had him step to the back of the vehicle with my
25 partner as well as Mr. Maynard.

71

1      What did you or other officers do at that point?
2  A   At that point in time, the K-9 officer had already
3  responded with his dog.  I went ahead and gave him the okay
4  to go ahead and conduct a free air sniff around the vehicle.
5        MR. BALAREZO:  Objection at this point, Your Honor.
6  Can we approach?
7        THE COURT:  All right.  Excuse us, ladies and
8  gentlemen.
9        (Bench conference.)
10       MR. BALAREZO:  Your Honor, my understanding, based
11 on this officer's police reports, is that the officer, the
12 K-9 officer, came in and had the dog sniff around the car,
13 that the dog came up positive, however you call it.  But that
14 that was told to this officer by the other officer.  I don't
15 know if this officer in fact, A, saw what the dog did.  B, is
16 qualified to testify about that.  I would say that it's
17 entirely hearsay for him to come here and say the other
18 officer told him that the dog came up positive.
19       THE COURT:  So what do we care about all this?
20       MR. GEISE:  I can move it along.
21       MR. BALAREZO:  Your Honor, I don't went it to come
22 in that the dog came up positive for drugs.
23       MR. GEISE:  My next question would be after the dog
24 sniffed, what did you do, sir.
25       THE COURT:  You're just getting to the money.  I

24

1  don't think it adds anything.  All right.  Sustained.
2        (Open Court.)
3  BY MR. GEISE:
4  Q   Sir, you were explaining some of the questions you had
5  asked Mr. Maynard and Mr. Gordon.  Were there any guns or
6  weapons.  Your assignment that day, was it just to doing
7  speed checks or did you have some other assignment as well?
8  A   I guess I have dual tasks.  I have a responsibility of
9  enforcing the law, the speeding law through the, on the
10 highway and also, as a criminal interdiction officer, my
11 primary responsibility is the detection of illegal substances
12 on the highways.
13 Q   Why don't you just explain a little bit more about what
14 an interdiction officer is doing?
15 A   An interdiction officer, primarily you monitor the
16 highway, you monitor the speeds of vehicles, and people
17 traveling up and down the highways, speeding, no seat belts,
18 careless or reckless driving.  And once you do that, most
19 people, I guess there's a right and a wrong way.  Most people
20 when they're doing things --
21       MR. BALAREZO:  Objection.
22       THE COURT:  Can we just move to the facts here?
23       MR. GEISE:  Yeah.
24 BY MR. GEISE:
25 Q   And so part of your function as an Interdiction officer

25

1  a to do what, sir?
2           THE COURT:   I'm sorry, can we just get to the
3  search?
4           MR. GEISE:   Yes, Ma'am
5  BY MR. GEISE:
6    Q   You were talking about the drug officer coming, the K-9
7  officer coming.  After the K-9 officer and the dog were at
8  the vehicle, what did you do then, sir?
   A   I just stood back, and I just watched the K-9 officer.
   Q   After the K-9 officer completed his duty, did you do a
   further search?
   A   Yes, sir, I did.
   Q   Would you describe to the jury what happened then?
   A   After the K-9 officer was done with the search, he came
   back --
   Q   Without going into what the K-9 officer told you, what
   did you do in response to that?
   A   I, in turn, searched the vehicle.
   Q   Would you describe to the members of the jury what
   happened?
   A   Right.  There was a special area of attention --
            MR. BALAREZO:   Objection.
BY MR. GEISE:
   Q   Did you focus your attention on a particular place?
       Yes, sir, I did.

26

       Where did *you* focus your attention?
   A   The rear hatch back and the rear passenger's seating
*area*.  Once I got inside the van, I noticed that the floor
was elevated.  And I knew that this was not a common
practice, unless there was some type of modification that had
6  been made outside of what the manufacturer --
            MR. BALAREZO:   Objection, Your Honor.  Beyond the
   scope of his knowledge.
            THE COURT:   I'm not sure it is.  How did you know
   there was some kind of modification?  Are you familiar with
   this kind of van?
            THE WITNESS:   Yea, Ma'am, as a criminal
   interdiction officer, we go through lots of a of training.
   Actually the week prior to the stop, I had just completed a
   week-long interdiction school, and one of the topics of
   discussion were mini vans.
            THE COURT:   Mini vans?
            THE WITNESS:   Yes, Ma'am.
            THE COURT:   Overruled.  Go ahead, Mr. Geise.
BY MR. GEISE:
   Q   You were saying *you* had noticed a modification in the
   vehicle?
   A   At that particular point in time, I didn't notice the
   modification.  I just noticed that the seats in the back was
   higher than they were supposed to be.

27

       What did you do at that point?
2  A   I was inside the vehicle.  I then got underneath the
3  vehicle where I noticed that it appeared that the vehicle had
4  two gas tanks.
5           MR. GEISE:   Your Honor, at this point, I'd like to
6  show the witness NC Stop 1.
            THE COURT:   These are photos.  Are you going to do
   more than one?
            MR. GEISE:   Yes, Ma'am
            THE COURT:   Any objection to -- what are the
   numbers so we can move it on?
            MR. GEISE:   We'll eventually do NC Stop 1, NC Stop
   2, NC Stop 3, NC Stop 4 and NC Stop 5.
            THE COURT:   All right.  Any objection to the first
   five?  Six is in already.
            MR. BALAREZO:   No, Your Honor.
            MR. GEISE:   Six is in already.
            THE COURT:   Okay.  Then fine, 1 through 5 are
   admitted.
            ( Government Exhibit Number a NC Stop 1
              through 5 were admitted into evidence.)
   BY MR. GEISE:
   Q   You're saying, sir, then you got out of the vehicle, and
24 what did you do?
25 A   I crawled underneath the vehicle.  Once I crawled

28

1  underneath the vehicle, I observed what appeared to be two
   fuel tanks or two gas tanks that were underneath the vehicle.
3  Q   Is that a picture of the underneath the vehicle in NC
4  Stop 1?
5  A   Yes, sir, it is.
6  Q   Let me also show NC Stop 2.  That also a picture of the
   underside of the vehicle?
   A   Yes, sir.
   Q   Now, what did you do at that point when you noticed
   there appeared to be two gas tanks?
   A   I just, I knew, based on my training and experience,
   that these vehicles *were* not equipped with two gas tanks.
   So I immediately started to trace the fuel line to the gas
   tank to find the actual gas tank, which I was able to do, and
   that left another area, which appeared to be a gas tank but
   it actually wasn't a gas tank, a fuel tank.
   Q   So what did you do after you traced the line and figured
   out one of the tanks was not indeed a fuel tank?
   A   The K-9 officer, also having the same training that I
   had, he actually was working on the top, and he was
   attempting to pull the carpet back that was in the rear hatch
   back area.  O the rear hatch area, kind of like the storage
23 area, extra space back behind the passenger's seats.  He said
24 that the carpet --
25          MR. BALAREZO   Objection.

28

BY MR. GEISE:
2  Q  What did you do then, sir?
3     THE COURT: Sustained as to the objection. Go
4  ahead. What did you do next?
5     THE WITNESS: I got out from underneath the
6  vehicle. I went to the rear passenger area and noticed that
   the carpet to the van had been glued down. I knew that the
   manufacturer did not glue carpet down in any vehicles. So I
   thought that this was very, very strange.
   BY MR. GEISE:
   Q  What did you do at that point?
   A  We began to start pulling up the carpet in the van, in
   the rear area. And once we started pulling up the carpet, we
   could, after we got to a certain point, we could see that
   there was a little opening that had been cut in the rear
   hatch back area, almost underneath the passenger's seat.
   Q  What did you do after you noticed this opening that had
   been cut?
   A  I knew that that definitely was not a manufacturer's
   design and pretty much I assumed that it was a hidden
   compartment that was inside the van.
   Q  What is a hidden compartment? The words are obvious
   but, I mean, what's a hidden compartment?
24 A  It is a compartment or a space where people usually use
25 to hide contraband.

38

   MR. BALAREZO: Objection, Your Honor.
2     THE COURT: Overruled.
3  BY MR. GEISE:
4  Q  What did you do once you noticed this area?
5  A  We started to, there were **two wires that I could
6  actually trace to it.** So we took some alligator clips, and
   that's just a police word for jumper cables, connected it to
   the battery, in turn went and connected to these two wires to
   get some type of electrocution to see if we could get the
   compartment to rise. That way --
   Q  Do these things usually have like a hydraulic door?
   A  Yes, sir.
      Please proceed.
   A  But it was later determined that it didn't operate or
   would not open due to electrification to the wires. So we
   then manually began to open up the trap door, the compartment
   door.
   Q  Let me show you what's been admitted as Government's MC
   Stop 3. Do you recognize that photo?
   A  Yes, sir.
   Q  What is it, sir?
   A  That was the kind of like the initial images, once we
   were able to get the door opened, just observed white Target
   store bags inside of the compartment.
   Q  What did you do at that point?

31

   A  So I knew that this definitely was not anything from the
2  manufacturer. So we continued to open up the door, the
3  compartment door, until we were able to actually get in and
4  put all the contents out.
5  Q  How many of these Target bags were in there if you
6  recall?
7  A  Five.
8  Q  What was in them sir?
9  A  U.S. currency.
10 Q  Let me show you what's been marked as MC Stop 4, ask if
11 you recognize that?
12 A  Yes, sir, I do.
13    What is that, sir?
14 A  That is money that was inside of the Target bags that
15 were inside of the compartment.
16 Q  Now, did you ultimately take all of the money out of
17 that compartment?
18 A  I did not. The K-9 officer did. My hands were too big.
19    He reached it out?
20 A  Yes, sir.
21 Q  And then was the money ultimately processed at your
22 headquarters?
23 A  Yes, sir, it was.
24 Q  Let me show you what's been marked as MC Stop 5. And
26 what is that, sir?

37

1  A  That's the money that was taken out of the bags that
2  were inside of the compartment.
3  Q  How much money was that?
4  A  It was $67,115 if I'm not mistaken.
5  Q  After you found this money in the compartment, and you
6  and the K-9 officer removed it, what did you do then?
7  A  At that point in time, I went to Mr. Wynard, since he
   was driving the vehicle. I asked him was he aware of the
   money that was inside of the compartment in the vehicle. He
   told me that, no, he wasn't. This was a company vehicle that
   was utilized for the company.
      MR. BALAREZO: Objection, Your Honor.
      THE COURT: Overruled.
      THE WITNESS: I guess he meant that for the Club
   Levels.
      THE COURT: Did he say that or just tell us what he
   said.
      THE WITNESS: He told me that it was a company
   vehicle that was used by the Club.
   BY MR. GEISE:
   Q  At that point, sir, what did you do?
   A  I then informed him that the money belonged to someone.
   And, I mean, no one **could be arrested for** it, but **we could do
   one or** two ways. Since the vehicle had an after market
   compartment in it, we were going to seize the vehicle along

33

1 with the money. That we could even, we could either count
2 the money on the highway, which we did not want to do.
3 I preferred to take it back to police headquarters
4 where we had a money counting machine that we could count the
5 money at. And we could also give him a receipt for the
6 money. So, they decided to go with option B, which was to go
   with us back to police headquarters so they could get a
   receipt for the money.
      Q   What did you do then?
      A   Mr. Maynard got in the vehicle with me. The money was
   secured in the trunk of my car. Mr. Gordon was, he got in
   the vehicle with my partner. They were transported up to
   police headquarters where the money was counted on a money
   counting machine.
      Q   What did you then do with the money and the vehicle?
      A   The money was taken and it was turned over to the task
   force person that's assigned with us on the Police
   Department. He, in turn, took the money to the bank and got
   a certified check for it. The vehicle was taken to our
   impound lot where it was stored.
      Q   And ultimately, both the money and the vehicle were,
   what are called, forfeiture proceedings beyond?
      A   Yes, sir.
      Q   But you don't handle those?
      A   No, sir.

35

1    Q   And if you remember, only if you remember, what was the
2  series of things you had to do?
3    A   The ignition switch had to be turned, not so the engine
4  was running but in between. You had to press the defrost,
5  the window defrost button, along with switching the
6  temperature gauge to the half way point. Then there was a
7  magnet that was located in the vehicle. You took the magnet
8  and rubbed it across the dashboard, and that would cause the
9  compartment to open and close.
10       MR. GEISE:   Court's indulgence for one moment.
11  BY MR. GEISE:
12    Q   Sir, you mentioned that Mr. Gordon had some money on him
13  when you stopped him?
14    A   Yes, sir.
15    Q   Did Mr. Maynard have any money with him as well?
16    A   Yes, sir, he did.
17    Q   And approximately how much was that?
18    A   I don't know. But I did fail to mention, prior to my
19  Terry frisk of him I noticed that he also had a bulge that
20  was in his right front pant pocket also. And he informed me
21  that it was money. And I told him just to take it out just
22  so I could confirm that it was money. He did tell me, but I
23  don't remember, how much money it was. But it was a large
24  sum
25    Q   Did you let Lt. Maynard and Mr. Gordon keep the cash

34

1    Q   Now, a couple of questions. How about Mr. Maynard and
2  Lt. Gordon?
3    A   Once they were, once the receipt was given to them at
   headquarters, they were free to go at any point in time. But
5  once they received the receipt, they just wanted to know
6  where the local Trailway station was at. So, one of the guys
   that worked with me actually gave them a ride down to the
   Trailway station where I assume they caught a bus.
      Q   A couple of other questions, after all of this, did you
   do any more examination on the vehicle itself?
      A   I did.
      Q   When was that?
      A   The following day. I was somewhat, I guess, bewildered
   that we couldn't electrify the cables or the wires that were
   running to the compartment. So I called up the instructor
   who teaches. I guess he's known as the interdiction guru.
   And I talked with him and told him what type of vehicle it
   was and some of the strange things that we had found.
         One of the strange things that we had found in the
   vehicle at that point in time, he just kind of talked me
   through a couple of different series. And later found out
   that the compartment actually required a series of events to
   take place in order to have the compartment open and close.
      Q   Were you actually able to open and close it?
      A   At some point I was later.

36

   they had on them?
2    A   Yes, sir. Also there was a jacket that was located in
3  the rear of the vehicle, like a bomber-type jacket, and it
4  also had money. I think it was like $1,500 that was in the
5  pocket, inside pocket of the jacket.
6       MR. GEISE:   No further questions of this witness,
   Your Honor.
         THE COURT:   Any questions?
         MR. BALAREZO:   Thank you.
                    CROSS EXAMINATION
   BY MR. BALAREZO:
      Q   Good morning, officer.
      A   Good morning.
      Q   Officer, this stop took place back on April 5 of '05,
   right?
      A   Yes, sir.
      Q   Given that it took place over a year and a half ago,
   would it be fair to say that your testimony here today is
   based mainly on your paperwork from that day?
      A   Yes, sir, it is.
      Q   That wasn't the only stop you've ever done, right?
      A   No, it's not.
      Q   And your testimony here today is not from your direct
   memory of what took place that day, except for a few things
   perhaps, right?

**37**

```
      Right.
2  Q  Now, you've indicated that you stopped this van for
3  speeding?
4  A  Yes.
5  Q  And that you talked to Mr. Maynard and to Mr. Gordon and
6  something that they said made you suspicious, right?
   A  Yes.
   Q  First of all, Antoine Jones was not in that van, right,
      I mean, just to make that clear?
   A  I don't know who Antoine Jones is.
      Q  So it's fair to say he wasn't in the van, right?
   A  Yes.
   Q  All right.  Now, once you talked to Maynard and Gordon,
      you called out the K-9 unit, right?
   A  Correct.
   Q  And then after that is when you decided to search the
      van after Mr. Maynard had given you consent as you say?
   A  Actually before I had made a determination that I was
      going to search the van.
   Q  Before he gave you consent?
   A  Yes.
   Q  Okay.  So, asking him for consent was just for the heck
      of it?
   A  No.
      Q  All right.  Well, you had already made the determination
```

**38**

```
   that you were going to do it no matter what, right?
2  A  Not necessarily.  I mean it was based on a lot of other
3  things, but I was primarily dealing with the traffic stop
4  when I had made my mind up.  So this was just another part of
5  the stop when I determined that I was going to search the van
6  and I asked for his consent to search the van.
   Q  But up until that point, there was nothing beyond the
      speeding, let's say, that was a crime or an offense?
   A  Other than the speed, at that point, there was no crime
      that had been committed.
   Q  All right.  Well let's get to the search.  You said
      that, at first, you went to the back of the van and you
      noticed that the floor was raised a little bit, right?
   A  Right.
   Q  And then it was very difficult for you to open it,
      correct, to open the compartment as you said?
   A  Yes.
   Q  Now, you've indicated several times that, based on your
      training, at least training that you had a week earlier, you
      were positive that this was not a manufacturer-type
      compartment, right?
   A  Right.
   Q  You kept saying that it was after market?
24 A  Right.  Manufacturers don't put compartments, single
25 compartments in vehicles.
```

**39**

```
1  Q  Now, did you at any point check this particular van and
2  this particular manufacturer, Honda Odyssey, to see?
3  A  That's one of the first rules of highway interdiction is
4  that any compartments that are put in the vehicles are after
5  market compartments.
6  Q  I'm not asking about the rules of interdiction.  I'm
   asking you did you, at any point, check with Honda about this
   particular van to see if that was done as an after-market
   type compartment?
   A  I did not specifically check with Honda, but I know that
   the vehicles are not equipped with compartments.
   Q  Well, during your week-long training and interdiction,
   did they actually tell you the Honda Odyssey, whatever year
   that van was, does not come with that type of compartment?
   A  Yes, I have been told that no vans or cars --
      I'm not asking about no vans.  I'
                                  No what?  The reporter
   can't get it.  Sorry.  He can finish his answer.
      MR. BALAREZO:  I'm not asking about the --
      THE COURT: I want to hear his answer. That's the
   problem. You cut him off.  Go ahead.
      THE WITNESS:  No.
      THE COURT:  No what? I'm sorry.
      THE WITNESS:  That the Honda Odyssey does not have
   an after-market compartment or that they don't put
```

**40**

```
   compartments in the Honda Odyssey van.
2     MR. BALAREZO:  Now, you've made me forget the
3  question.
4     THE COURT:  Sorry, but you've got to go a little
5  slower please.
6     MR. BALAREZO:  Very well, Your Honor.
   BY MR. BALAREZO:
   Q  Now, so let's just get to the search.  You went to the
   back of the van.  At first you noticed that it was raised a
   little bit, right?
   A  Yes.
   Q  You couldn't pull the rug up, the carpet, right?
   A  Right.
   Q  As you've indicated, it was glued down?
   A  Right.
   Q  Then you went under it and you tried to follow the gas
   line to the tank, right?
   A  Right.
      Do you have any pictures up there?
   A  No, I do not.
   Q  Just so I know what you're talking about, I am going to
   show you Government's NC Stop Number 1.  Do you see that?
   A  Yes.
   Q  And I'm pointing to this area here.  Is that a gas tank?
      Yes, it is.
```

41

1    Is that the real one or the fake one I'm pointing to?
2    A    That's the real one.
3    Q    And where is the after-market one?
4    A    The one that's, It was added in there. I guess what
5    happened was --
6         THE COURT:    He just wants to know where it is in
7    the picture?
8    BY MR BALAREZO
9    Q    Well, don't guess. I'm asking you, yeah, where is it?
10   A    I'm not guessing. It's before, It's actually the very
11   front of the vehicle coming backwards, the contour of the
12   tank, It's that portion of It.
13   Q    So you're saying that this is the second gas tank?
14   A    No, that's not even the gas tank that you're pointing
15   out.
16   Q    Why don't you just get up and show us on that picture so
17   the jury can see?
18   A    I'm talking about this area right here. This is the
19   area.
20        THE COURT:    I can't tell what he's --
21        MR BALAREZO    I'll trace it with this. Go ahead.
22        THE COURT:    Go ahead.
23        THE WITNESS:    The area here is the area of concern.
24   BY MR. BALAREZO
25   Q    This area?

42

1    Yes.
2    Q    So you're saying that there's another tank there?
3    A    Yes, the tank has been modified. It's a test like the
4    tank, an addition has been made to the tank.
5    Q    I'm not asking, if you could just focus on what I'm
6    asking you. In this particular picture though, it's not
7    readily apparent that there is a second gas tank or a
8    compartment, is there?
9    A    No, just by looking at it there, no, it's not.
10   Q    And Government 'a NC Stop 2, can you see it here?
11   A    Yes, you can.
12   Q    Where is it?
13   A    That blue area there, that's where the addition has been
14   made and that's where the extra had been added on. That's
15   where the compartment is at. That's actually a better view.
16   That's from the middle point of the van, pointing outward.
17   Q    So you're saying that that is different from this
18   particular tank?
19   A    Yes, it is. No, it's the same tank, but it's just a
20   different view of it.
21   Q    And somewhere in there is that second compartment?
22   A    Yes.
23   Q    Now, they do look remarkably similar though, don't they?
24   A    They do.
25        Like one tank?

43

1    They do.
2    Q    Now, you had problem opening the compartment from the
3    inside of the van, right?
4    A    Initially, we did, yes.
5    Q    All right. So based on what you described that you have
6    to do to open the van, this is not something that someone
7    could just reach in, get anything out and close it back up,
8    right? There was a whole procedure that had to be done
9    according to you?
10   A    Yes.
11   Q    When did you actually do that procedure that you
12   mentioned?
13   A    The following day.
14   Q    Based on what you had talked about to your Instructor?
15   A    Yes.
16   Q    And the electricity that you ran through it the day
17   before when you ran the cords, that didn't affect it in any
18   way?
19   A    No, It did not.
20   Q    Now, when you talked to M. Maynard, at any time did
21   Maynard mention Antoine Jones to you?
22   A    Not specifically, no.
23   Q    Well, either he did or he didn't?
24   A    No.
25        Now, Maynard, at some point after you stopped him

44

1    seized the money and went back to the station, he did make a
2    statement, correct?
3    A    I don't know specifically what you're talking about.
4    Q    Well, you took him back to the station and asked him
5    questions about what was going on, correct?
6    A    Oh, yes. They were interviewed separately, he and
7    M. Gordon.
8    Q    And you Interviewed him?
9    A    I sat in on the interview, yes.
10   Q    Isn't it true that Maynard at some point indicated that
11   he was purchasing that van from Antoine Jones?
12        MR. GEISE:    Objection, Your Honor, if we could
13   approach.
14        THE COURT:    Okay. Let's approach.
15        ( Bench conference. )
16        THE COURT:    What is wrong with that?
17        MR. GEISE:    This time I think it really-
18        MR. BALAREZO    This time I think It's --
19        MR GEISE:    It really is hearsay.
20        THE COURT:    He is not offering it for truth.
21        MR GEISE:    Yes, he wants to on, testify that
22   Maynard had control of that van and therefore it is not
23   M. Jones. That's for the truth I think.
24        THE COURT:    This is all part of the conspiracy,
25   too.

45

        W. GEISE: Yes, except I can offer it -

2     -LL BALAREZO. I can't ask any questions he said.

3     MR GEISE: If I offer it against him--

    THE COURT: Are you offering this for the truth?

    MR BALAREZO: Your Honor, it is the same reason why this officer took the actions that he did. It is the same thing. That the Government was --

    THE COURT: My do we care what he did back at the Station? What Is the relevance of that?

    kR. BALAREZO: That' a why he let fkynard go. k4ynard said he was purchasing the car because he understood the honey --

    THE COURT: Who cares if he let him go. Heat la the relevance of that? Sustained. Okay.

    (Open Court.)

BY NR. BALAREZO:

Q  Officer, at the tine of this stop, you had no idea how long Lawrence fkynard had been driving thi a van, right?

A  No.

Q  You had no idea how often he used it, correct?

A  Not really, no.

    Either you did or you didn't?

    I mean, we talked about it briefly. I mean --

Q  drove It often, correct?

    drove it pretty often, yeah.

46

    Okay.

2 A  But it was a company van, so he was not the only one that drove it.

4 •  It was a conpany van. And you said that that •- so he did Indicate that other individual a had access to that van

6 also, right?

7 A  Yes.

•  At no point did he say Antoine Jones drove that van regularly?

    kR. GEISE: Sane objection, Your Honor.

    THE COURT: Overruled.

BY M GEISE:

Q  At no point did he tell you that Antoine Jones drove that van, correct?

A  No.

Q  Now, you have no evidence and you can't tell this jury, based on your training, your experience as the Interdiction officer, that or when that particut comport rent was placed in that van, correct?

A  No.

•  You have no idea whether or not that -- well, you do have sone docurrenta that indicate that the van was purchased used, correct?

A  Yes.

Q  You have no evidence to show that that conpartnest --

47

you can't tell this jury that that compartment was not in the

2 van at the tine of that purchase, correct?

3 A  I don't know, no.

4 •  You can't tell them that?

5 A  No.

6 •  So you don't know if the original owner put in that

7 conpartment, correct?

A  Correct.

Q  Now, once you located this particular conpartment, you searched the van thoroughly, correct, you or the other officers on the scene?

A  Right.

•  There was absolutely no drugs found in that van, correct?

A  No, there was not.

•  Of any type?

A  No.

•  There was nothing in that van tying it to Antoine Jones, correct?

A  Yes, I did find sonething with Antoine Jones' a name.

Q  Ws that in these document at that you indicated earlier?

A  I'm not sure if I trade a copy of it or not. I'm pretty certain that I did.

Q  Do you recall what it was?

I1  was a receipt for Jiffy tube, actually It was two

48

receipt of or Jifly Lube for of lchanges.

2 Q  All right. But you don't have that now, do you?

3 A  I have 1 hem in try bag. I do.

4 •  I at his sonething that you produced to the Government

5 before?

6 A  I feel pretty certain that I did. I'm not absolutely certain, but copies of everything that I had, that I took, I trade copies of and I sent.

Q  When would you have produced that?

A  The sane tine I produced the notes and pictures and everything at set hat I had given.

Q  But even if you had found a receipt for Jiffy Lube containing -- was his none on there?

A  Yes, It was.

Q  That does not indicate that he owned the van, correct?

A  I would say it would.

•  I'm not asking what you say or what you think?

A  The vehicle had 1 he lof or notion on there. He had to be the one to give the information. Whoever takes the vehicle in for the of lchange is normally who none they put down.

Q  yell, if I take my wife' a car in for an auto [aic] change, it doesn't swan that I own the car, right? It just rreans I took it In for an auto change or an oil change, right?

A  Right.

49

   So you can't nuke that assunption, correct?
A  Correct.
Q  Now, with respect to these documents that the Governnent rent i oned I n NC Stop Nunber 10, al I that you had i n there was a temporary Inspection waiver, correct? That was one of the documents t hat was i ncl uded?
   THE COURT: yibit. Ten, he didn't -- he didn't retrieve results from the car, did he?
   AR. BALAREZO: These are i n evidence, right?
   THE COURT: They're i n evidence, yes, but he didn't pick them up out of the car I assune, right?
   THE W TNESS: No, I di d not.
BY bR. BALAREZO:
Q  Let ne show you NC Stop 10. Do you see a document In there that's called an inspection certificate?
A  I do.
Q  Ant of ne Jones' a nine anywhere on t hat inspect i on certificate?
A  No, it's not.
Q  And what's the date of that certificate?
A  kby 11, 2004.
Q  How long bef ore t he stop was t hat ?
A  El even sent hs.
Q  And is there a certificate of title for a vehicle also f n that at ack of docunentat

50

   Yes, it is.
Q  Antoine Jones's nave does appear on t hat one, right?
A  I t does.
Q  I draw your attention to Box A, towards the riddle bottom of t he page. There' al so a date, correct?
A  Yes, it Ia.
Q  Mat i a t hat date?
A  11 My 2004.
Q  How long before this stop was that?
A  Sane tine l engt h, about 11 sent hs.
Q  There is also an application for a certificate of title, i s there not?
A  Yes, it is.
Q  Antoine Jones's nacre i s on there, right?
A  Yes.
Q  Mat date was that?
A  11 My 2004.
Q  Sane tine difference between that date and when it was stopped?
A  Yes.
Q  Sir, a temporary inspection waiver?
A  Yes, it is.
Q  Antoine Jones's nave I a on t here?
A  Yes.
   There's no date, correct?

51

   No date.
Q  So, none of these docunenta did *you* find in the van, correct?
A  No.
Q  And at no point, as they said, did hbynard tell you that I t was Jones' a club or Jones' a car, correct?
A  No.
Q  You yourself, you didn't run a registration on the car to see who owned It, right?
A  I did. That was part of running the vehicle's I of or not I on, yes.
Q  And that was part of it. Now, you did write a report nenorIalizing this particular traffic stop, did you not?
A  yibul d you repeat t hat?
Q  You wrote a report which nenorialized the traffic stop? You wrote down what happened?
A  Yes.
Q  Right ? And that was actually a, i f I'm correct, a nine-page typewrItten report of everything that happened, r f ght ?
A  Yes.
Q  Ofd you write down anywhere in that nine-page report, which was very detailed, that you ran a registration check on the car and that Antoine Jones's nave cane up as the owner at t hat t I *no*?

52

   I did not .
Q  And you al so did a Durham Police Depart rent offense report. Do you renenber doing that one?
A  Yes.
Q  That was a si x- page, single-spaced, very detailed report, correct?
A  Yea.
Q  And no where on t here did you i ndi cat e t hat you did t he registration check at that tine and Antoine Jones cane up as t he owner, right?
A  No, I did not.
Q  Now, wasn't t hat I sport ant at t hat t f ne considering t hat you stopped this vehicle and you ended up seizing $67, 000. You didn't care to know or didn't think it was fnportant to write down who the owner was?
A  Oh, It we a Important.
   You just didn't write i t down?
A  Just didn't need t o be referenced I n t he report.
Q  You indicated t hat t he currency t hat was found inside of the -- I' m going t o show you NC Stop 5. The currency that was found Inside of the van was contained Inside of plastic Target bags?
A  Yea.
Q  And is that one of t he bags? I can't tell. This one right here.

53

```
        THE COURT:    Do you see Mat he's talking about?
        THE WITNESS:   Honestly, I have no idea what that
is.  I did not take the picture.
BY MR. BALAREZO:
 Q   That's fino.   Did you preserve the bags in any manner,
so that you could obtain perhaps fingerprints or anything of
that nature?
 A   No.
 Q   Okay.   So, given that you didn't preserve, then it's
probably fair to assure that you didn't fingerprint the bags
in any way?
 A   W: did not.
 Q   Okay.   So you can't tell the jury that Antoine Jones'
fingerprints were anywhere on that bag?
 A   I could not.
 Q   And you probably also didn't do any forensic testing,
right, that you found a hair belonging to Antoine Jones in
that bag or on the money?
 A   I did not.
 Q   You have nothing to tie that money to Antoine Jones,
right?
 A   No.
        MR. BALAREZO I have nothing else, Your Honor.
                    CROSS EXAMINATION
```

54

```
BY MR. NORRIS:
 Q   Good day, Officer Whitehead.
 A   How you doing?
 Q   For the record, Attorney John Norria on behalf of Mr.
Adrian Jackson.   Officer Whitehead, the only two occupants
were Mr. Maynard and Lt. Gordon; is that correct?
 A   Yes, sir.
 Q   Okay.   So Adrian Jackson was not in that van that day,
correct?
 A   I don't know Adrian Jackson, so I know he was not in the
van.
 Q   Okay.   And if you don't know him his a name wasn't
mentioned that day by either W. Maynard or Gordon, correct?
 A   No.
 Q   There is nothing, that you're aware of, connecting him
with that van, correct?
 A   Not to my knowledge.
        MR. NORRIS:    Thank you, sir.
        MR. McDANIEL:    No questions, Your Honor. Thank
you
        MR. ACREE:    No questions, Your Honor.
        THE COURT:    Anything further from the Government
briefly?
        Mr. GEISE:    Yes, Your Honor.
                    REDIRECT EXAMINATION
```

55

```
BY MR. GEISE:
 Q   Mr. Balarezo asked you some questions about what
Mr. Maynard told you.   He never used the name Antoine Jones?
 A   I don't remember. I didn't make reference to it in my
report if so.
 Q   Did he tell you who else drove the van, not by name but
by what they did?
 A   He said his partner drove the van.
 Q   And his partner in what?
 A   The business that he owned and that they owned together.
 Q   That business vies what?
 A   The Club Level a.
 Q   Now, Mr. Balarezo was asking you some questions about NC
Stop 10, which was those M V. A document a?
 A   Yes, sir.
 Q   Which you did not obtain?
 A   No, sir.
 Q   I'm not sure you can read it here.   I'll bring the item
P.
        MR. GEISE:    If I can approach the witness, Your
Honor.  I'm not sure it can be read. Let me show him and
then I'll put it back. I am going to ask you to note the
date on there.
        THE COURT:    The document speaks for itself. The
date is the date.
```

56

```
        Mr. GEISE:    Yes, Your Honor.   I just wanted to
note --
        THE COURT: Pity 6, 2005.
        ML GEISE:    Aby 6, 2005, is the date that this
document was obtained by its seal.
        MR. BALAREZO   Your Honor, there is no evidence
that that is the case.
        THE COURT: I think, as a public document, it does
say that. It says it right to the left of the date. Okay.
BY MR. GEISE:
 Q   And Aby 6, 2005, how long after your atop was that?
 A   One rmnth.
 Q   Now, Mr. Balarezo asked you if you know when that
after-market conpartnent was placed in the vehicle.   And you
don't know that?
 A   No, sir.
 Q   And you don't know maybe somebody just loft the $67,000
in there when they sold the car?
 A   As far as I know, yes.
     Very likely?
        Mr BALAREZO    Objection.
        THE COURT:    Sustained.   Strike the answer.
Anything else?
        Mr. GEISE:    No further questions.
        THE COURT:    You can ask two questions.   They have
```

57

to relate to what he just did though.
                    RECROSS EXAMINATION.
BY MR. BALAREZO
Q   Officer, Mr. Geise just asked you questions about what
Mhynard told you was the job or the occupation of the other
person that drove, one of the other persons who drove the
van?
A   Yes, sir.
Q   You didn't write that down in that nine-page or that
six-page report, did you?
A   I did not.
Q   Didn't include it in any way?
A   No.
    MR. BALAREZO    Nothing else.
    THE COURT:   Okay.  Thank you, sir.  You may step down.
    (Witness excused.)
    THE COURT:   Ladies and gentlemen, it's a good time to take a break.  It's now about ten of, so we'll recess until 11:00.  Thank you.  Leave your stuff there.  Don't discuss the testimony.
    (Jury Out.)
    THE COURT:   The next witness is Mr. Bermea.  As I said, we'll break by 12:30.
    MR. LIEBER:   Just very quickly, as a follow-up to

58

yesterday, the Court noted that Juror Number Five admitted a rather significant yawn. I would also note that, again, he was sleeping. I saw a head bob. If you want me to flag it for the Court during the time, I will.  I don't want to interrupt the proceedings.
    THE COURT:  I guess you're going to have to because, I mean, I heard the yawn, obviously, and there are various techniques to keep people awake.  Sometimes they have to stand up for a while.  I've been very attentive.  I'm sorry, I did not see that.
    You can ask to approach if you really, really believe he's asleep.  We can figure it out.  Sometimes people are slightly likely to close their eyes.  Anything else before we break for ten minutes?
    MR. GEISE:   No, Your Honor.
    THE COURT:  Okay.  Thank you.  Ten minutes, please.
    (A brief recess was taken.)
    MR. BALAREZO:  I just asked the Government whether or not they had any further -- whether the Government had any further Jencks or any other slat events of this witness.  They have indicated that they do have some 302s from the debriefings and whatnot, but that they will not turn them over.
    I believe that those should be turned over as, first of all, record of the debriefings.  Number two, they

59

are Jencks.  They are statements that this individual made that somebody else took down, and I think that that should be --
    THE COURT:   That's the problem  It depends.  Are they substantially verbatim?
    MR. GEISE:   In the D.C. Circuit, as the Court knows, I think the case is Tarrantino, although I can pull it, says that generally 302 debriefings are not Jencks material.
    THE COURT:   Right.  How many are there?
    MR. GEISE:   I think one, maybe two, Your Honor.
    THE COURT:   Generally, I look at them
    O. BALAREZO I would ask the Court at least, at the very least, to look at them
    THE COURT:  If you give them to me before lunch, I'll do it, as long as it's not terribly lengthy.   But if they're not substantially verbatim and only those parts that are substantially verbatim is all you're entitled to, and generally speaking, these people don't take it that way, if they know what they're doing.
    That's all we're talking about is 302s, correct?
    MR. GEISE:   Yes, Ma'am
    THE COURT: I generally feel perfectly comfortable looking at the stuff.
    MR. BALAREZO   And just so the record is clear,

60

there is no other Jencks or any other material that the Government has on this witness.
    MR. GEISE:   No, we've given them everything.
    THE COURT: Is there grand jury?
    MR. GEISE:   No.
    THE COURT:   All right.  Your counsel is out there, but once we start, sir, you're not able to discuss your testimony with anybody.  Do you understand?
    THE WITNESS:   Yes, Ma'am
    THE COURT:   Are we ready to go?
    MR. GEISE:   Yes, Your Honor.
    THE COURT:   Okay.
    (Jury Present.)
    THE COURT:   Okay.  Ladies and gentlemen, is everybody ready? Let us begin.  You can swear the witness please.
              ROEL BERMEA, GOVERNMENT WITNESS, SWORN
                      DIRECT EXAMINATION
BY MR. GEISE:
Q   Good morning, Mr. Bermea. Would you please state your name and spell your last name for the Court Reporter.
A   Roel Bermea, B-E-R-M-E-A.
Q   Now, Mr. Bermea, just a little bit of brief background. Would you tell us where were you born, sir?
A   I was born in McAllen, Texas.